The document below is hereby signed.

Signed: May 11, 2009.



_____
S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

In re                          )
                               )
ELLIOTTE PATRICK COLEMAN,      )      Case No. 06-00254
                               )      (Chapter 13)
                 Debtor.       )
_____)
                               )
ELLIOTTE PATRICK COLEMAN,      )
                               )
                               )
              Plaintiff,       )
                               )      Adversary Proceeding No.
           v.                  )      07-10022
                               )
COUNTRYWIDE HOME LOANS,        )      Not for Publication in
INC.,                          )      West's Bankruptcy Reporter
                               )
                 Defendant.    )

MEMORANDUM DECISION REGARDING
PENDING MOTIONS FOR SUMMARY JUDGMENT

This memorandum decision addresses the cross-motions for

summary judgment filed by the plaintiff Elliotte Patrick Coleman

and the defendant Countrywide Home Loans, Inc. ("Countrywide").

(Docket Entry ("DE") No. 28 and DE No. 30.)

Coleman filed this adversary proceeding alleging that

Countrywide breached its implied duty of good faith and fair

dealing with respect to his mortgage by promising him a second
loan modification without ever intending to fulfill that promise.
His complaint further alleges that Countrywide committed a breach
of contract by failing to timely and adequately respond to his
request for an account reconciliation in violation of the Real
Estate Settlement Procedures Act ("RESPA").

For the reasons that follow, I will grant summary judgment
in favor of Countrywide as to both claims, and deny summary
judgment as to the plaintiff.

I

On December 1, 2000, Coleman purchased the real property
located at 2730 Knox Terrace, SE, Washington, DC 20020 (the
"Property").  As part of that purchase, he signed a Promissory
Note and a Deed of Trust (collectively, the "Mortgage") with Bank
of America, N.A. ("Bank of America") for $146,179 at 7.45% yearly
interest for thirty years.  (Def. Mot. S.J., Att. 1 and Att. 2 to
the Affidavit of Jonathan Hyman ("Hyman Aff."))  The debtor's
monthly payment including principal, interest, and escrow was
$1,255.  (Def. Mot. S.J., Att. 1, Att. 2, Att. 4 to Hyman Aff.)
Shortly after Coleman purchased the property, Bank of America
assigned the Mortgage to Countrywide.  Plaintiff learned of the
assignment in January 2001 after he made his first monthly
mortgage payment to Bank of America.

Also in January 2001, Coleman received a Notice of Federal Tax Lien from the Internal Revenue Service dated December 29, 2000, in the amount of $20,646.74. (Pl. Mot. S.J., Ex. A.)

<u>First Loan Modification</u>

Coleman lost his job on or about January 2002 and consequently became delinquent on his monthly mortgage payments.[1] (Pl. Mot. S.J. at 2.) On April 19, 2002, Countrywide sent Coleman a foreclosure notice stating that the minimum balance required to cure Coleman's default was $9,700. (Def. Mot. S.J., Att. 5 to Hyman Aff. (Notice of Foreclosure Sale of Real Property).) Coleman contacted Countrywide to stay foreclosure proceedings and requested a loan modification. (Def. Mot. S.J., Statement of Undisputed Facts ("SUF") ¶ 5.) Countrywide agreed to stay foreclosure proceedings and consider the Mortgage for a loan modification.

Prior to late 2005 or early 2006, all borrowers requesting consideration for a loan modification had to sign a "Negotiation Agreement" with Countrywide. (Def. Mot. S.J., Affidavit of Sheryl Valvo ("Valvo Aff.") ¶ 6.) Countrywide has submitted a copy of a Negotiation Agreement signed by Coleman on December 10,

_____

[1] Coleman, who is proceeding *pro se*, did not file a Statement of Undisputed Material Facts with his Motion for Summary Judgment. (DE No. 30.) The court has therefore consulted the section of the plaintiff's Motion for Summary Judgment entitled "Background" for certain of the facts included here.

2004, presumably in connection with one of Coleman's later requests to Countrywide for a loan modification. (Def. Mot. S.J., Att. 1 to Valvo Aff.; Def. Mot. S.J., Att. 6 to Hyman Aff.)  That Negotiation Agreement provides:

> When signed by both of us, this letter will constitute a binding agreement ("Agreement") between you and Countrywide concerning Countrywide's workout discussions with you . . . We each acknowledge and agree that neither of us shall be bound by any workout agreement concerning your Loan until such agreement has been put in writing, is signed by each of us and is returned to Countrywide . . . We each acknowledge and agree that Countrywide will not consider entering into any workout agreement concerning your Loan until it first receives all the information that it requires in its sole judgment to evaluate such an agreement.

(Def. Mot. S.J., Att. 1 to Valvo Aff., Att. 6 to Hyman Aff.) Coleman was required to sign a Negotiation Agreement every time he requested a loan modification or workout.  (Def. Mot. S.J., Valvo Aff. ¶ 6.)

Countrywide determined that Coleman was eligible for a loan modification.  On June 5, 2002, Coleman and Countrywide entered into a loan modification agreement in which Coleman's default obligation was added to the principal of his Mortgage resulting in a new principal amount of $152,419.51 ("Loan Modification Agreement").  (Def. Mot. S.J., Att. 3 (Loan Modification Agreement) to Hyman Aff.))  The Loan Modification Agreement had a fixed yearly interest rate of 7.45% and required monthly payments including principal, interest, and escrow, of approximately $1,350 as of June 1, 2002, until 2032.  (Pl. Mot. S.J. at 3

4

(stating that monthly payments rose to $ 1,3050 [sic]); *but see*
Def. Mot. S.J., SUF ¶ 7 (stating that monthly payments rose to
$1,300); Def. Mot. S.J., Att. 3 (Loan Modification Agreement) to
Hyman Aff. (stating that monthly principal and interest payments
would be $1,060.53).)

Spring 2003: Further Loan Modification Requested by Coleman

Coleman again defaulted on his payments and by February 12,
2003, the total amount past due was $4,301.16.  (Def. Mot. S.J.,
Valvo Aff. ¶ 8; Pl. Mot. S.J., Ex. F (Letter to Coleman from
Countrywide Loan Counselor Amanda Gustafson, Feb. 12, 2003).)
Coleman requested a second loan modification, but Countrywide
determined that he did not qualify for one.  (Def. Mot. S.J.,
Valvo Aff. ¶ 8.)

Coleman asserts that in April 2003, Countrywide agreed to a
second loan modification provided Coleman pay $2,800 to
Countrywide by April 30, 2003.[2]  (Pl. Mot. S.J. at 3.)  However,
in a letter of October 23, 2004 to an Assistant Deputy
Commissioner of the District of Columbia's Department of
Insurance, Securities and Banking ("DISB"), Coleman states that
Countrywide "offered to accept a payment of $2,800.00 by April
30, 2003 as an initial payment *towards a workout or loan
modification*."  (Pl. Mot. S.J., Ex. K (Letter from Coleman to

---

[2]  Coleman alternatively refers to the amount of this
payment as $2,800 and $2,985.

5

DISB, Oct. 23, 2004) (emphasis added).)  Coleman further asserts
that after he paid $2,800 to Countrywide by April 30, 2003,[3]
Countrywide withdrew its agreement to a second loan modification.
(Pl. Mot. S.J. at 3.)  There is no written evidence of a second
loan modification agreement between Coleman and Countrywide in
2003.

### July 24, 2003 Repayment Plan Agreement

Countrywide and Coleman agreed to a 24-month repayment plan
on July 24, 2003 ("Repayment Plan Agreement").  (Def. Mot. S.J.,
Att. 7 (Repayment Plan Agreement) to Hyman Aff.)  Coleman was
required under the terms of the Repayment Plan Agreement to make
monthly payments of $1,674 to Countrywide for twenty-four months
to cure the default amounts. (*Id.*)  Further, in exchange for
being permitted to enter into the Repayment Plan Agreement,
Coleman agreed "to release and discharge [Countrywide] . . . from
any and all claims" and that this release "shall include all and
any claim whatsoever of every nature concerning the Loan . . .
including, but not limited to, claims arising under . . . *Real
Estate Settlement Procedures Act* . . . ."  (Repayment Plan
Agreement at p. 2 (paragraph entitled "Read Carefully - Specific

---

[3]  As evidence of his $2,800 payment to Countrywide in April
2003, Coleman has submitted a Western Union Quick Collect form in
the amount of $800. (Ex. G. to Pl. Mot. S.J.)  At a hearing held
on the parties' cross-motions for summary judgment, Coleman
stated that his father paid the remaining balance of the $2,800
payment.

Release of Claims").)

## March 2004: Coleman Files DISB Complaint

Sometime in March 2004, Coleman filed a complaint with the
DISB, asserting that Countrywide reneged on a commitment to enter
into a second loan modification after accepting his $2,800
payment in April 2003.  (Pl. Mot. S.J., Ex. G (Letter from Terry
O'Keefe, Paralegal, Office of the General Counsel, District of
Columbia, Department of Banking and Financial Institution to
Coleman, Mar. 17, 2004).)  The DISB must have contacted
Countrywide about Coleman's complaint because on March 31, 2004,
a Countrywide employee wrote to the DISB and copied Coleman
explaining that Countrywide did not agree to modify Coleman's
loan a second time in 2003 because only one year had passed since
the 2002 modification.  (Pl. Mot. S.J., Ex. O (Letter from Sandra
Harpham, Executive Research Specialist, Office of the President,
Countrywide to Evelyn Carmen, Assistant Deputy Commissioner,
DISB, Mar. 31, 2004).)  Countrywide also stated that it would
stay foreclosure proceedings pending workout discussions with
Coleman and that it would mail a new "Workout Package" to
Coleman, (*id.*) which Coleman received in late March 2004, (Ex. K
(Letter from Coleman to DISB, Oct. 23, 2004) to Pl. Mot. S.J.)
On April 1, 2004, the DISB wrote to Coleman informing him that
Countrywide had agreed to discuss the matter with him and had
agreed to postpone referring the mortgage for foreclosure until

7

April 15, 2004 to give Coleman time "to make arrangements with
them," and advising him that he should make arrangements to
complete what DISB called the "modification package" (and what
Countrywide called a "Workout Package") that Countrywide had sent
Coleman.  (Ex. H (Letter to Coleman from DISB) to Pl. Mot. S.J.)
Coleman completed the "workout package" and transmitted it to
Countrywide.  (Ex. K (Letter from Coleman to DISB, Oct. 23, 2004)
to Pl. Mot. S.J.)

<u>July 16, 2004 Forbearance Agreement</u>

Between July 2003 and July 2004, Coleman fell behind on his
mortgage payments under the terms of the Repayment Plan
Agreement.  On July 16, 2004, Countrywide and Coleman entered
into a Special Forbearance Agreement, which required Coleman to
make partial payments to Countrywide, in the amount of $691.73,
for each of the months of July, August, and September of 2004.
(Def. Mot. S.J., Att. 8 (Special Forbearance Agreement) to Hyman
Aff.)  As in the case of the Repayment Plan Agreement (using
identical language), Coleman released Countrywide from all claims
relating to the loan.  (Special Forbearance Agreement at p. 2.)

<u>Coleman's October 2004 Renewed Complaint to DISB</u>

In October 23, 2004, Coleman wrote to the DISB asserting
again that Countrywide had again reneged on its commitment to
modify his loan.  (Pl. Mot. S.J., Ex. K (Letter from Coleman to
DISB, Oct. 23, 2004).)  The DISB again wrote to Countrywide, (Pl.

Mot. S.J., Ex. L.), and Countrywide responded by reiterating its earlier written statement that Countrywide had determined that Coleman's loan was not eligible for a second modification, and also explained that the parties had a forbearance agreement pending possible resolution of a formal repayment plan.  (Def. Mot. S.J., Att. 9 (Letter from Edwin Cruz, Executive Research Specialist, Office of the President, Countrywide to Evelyn Carmen, DISB, Nov. 22, 2004)to Hyman Aff.)

<u>December 10, 2004 Second Repayment Plan Agreement</u>

Coleman and Countrywide entered into a second repayment plan ("Second Repayment Plan Agreement") on December 10, 2004, pursuant to which Coleman agreed to pay Countrywide $2,102 in monthly mortgage payments for twenty-four months commencing January 10, 2005.  (Def. Mot. S.J., Att. 10 (Repayment Plan Agreement) to Hyman Aff.)  As in the case of the initial Repayment Plan Agreement (using identical language), Coleman released Countrywide from all claims relating to the loan. (Second Repayment Plan Agreement at p. 2.)

2005-2006: Countrywide Stays a
Foreclosure and Considers (But Denies)
<u>Coleman's Request for Further Loan Modification</u>

In January 2005, Coleman contacted the National Community Reinvestment Coalition ("NCRC") for assistance with his continued

9

efforts to obtain a second loan modification from Countrywide.[4]
In March 2005, relying upon advice from NCRC, Coleman ceased
making payments to Countrywide. (Pl. Mot. S.J. at 7; Def. Mot.
S.J., Valvo Aff. ¶ 11.)  In April 2005, Countrywide cancelled the
Second Repayment Plan Agreement after Coleman defaulted on his
payments under that plan. (Def. Mot. S.J., Valvo Aff. ¶ 10; Def.
Mot. S.J., Att. 16 to Hyman Aff at 2.)

On June 10, 2005, Countrywide sent Coleman a second
foreclosure notice, which stated that the minimum balance due on
the note to cure Coleman's default obligation was $23,300.  (Def.
Mot. S.J., Att. 11 to Hyman Aff.)  At Coleman's request,
Countrywide agreed to stay the foreclosure and to again consider
his Mortgage's eligibility for a second loan modification.  (Pl.
Mot. S.J., Ex. T (E-mail from Lisa Caffrey, FVP and Senior
Counsel, Countrywide Home Loans, to David Berenbaum, NCRC, June
22, 2005); Def. Mot. S.J., Valvo Aff. ¶ 11.)

On November 11, 2005, NCRC contacted Countrywide to request
a loan modification on Coleman's behalf.  (Def. Mot. S.J., Att.
16 at 2 (Letter from Patricia Jordan, Workout Department,

---

[4]  As part of Coleman's claim that Countrywide breached its
implied duty of good faith and fair dealing with respect to his
Mortgage, he alleges wrongdoing by NCRC employees, specifically
Kevin Parker, Fair Lending Specialist, and David Berenbaum,
Executive Vice President, in connection with Coleman's efforts to
obtain a second loan modification from Countrywide with NCRC's
assistance.  These allegations are irrelevant to the question of
whether Countrywide breached its duty of good faith and fair
dealing, so the court will not elaborate on them here.

Countrywide to Tonya L. Waller, Esq., Nov. 15, 2006) to Hyman
Aff.)  Countrywide agreed to consider the loan for modification
and requested Coleman's monthly financial statements and
verification of his income.  (*Id.*)  Countrywide received the
monthly financials and the verification of income, but the
verification of income consisted of dark, illegible checks. (*Id.*)
Countrywide left voice mail messages for NCRC and Coleman on
October 11, 2005, October 19, 2005, November 8, 2005, November 9,
2005, and December 20, 2005 requesting legible copies of
verification of income.  (*Id.*)  Because Countrywide did not
receive legible proof of Coleman's income, it closed the file on
January 13, 2006, and flagged the loan to return to normal
servicing.  (*Id.*)

On February 24, 2006, Countrywide sent Coleman a third
foreclosure notice, which stated that the minimum balance due on
the note to cure Coleman's default obligation was $36,631.52.
(Def. Mot. S.J., Att. 12 to Hyman Aff.)

On February 27, 2006, in response to the third foreclosure
notice, an NCRC employee contacted Countrywide's in-house counsel
about the status of Coleman's request for a second loan
modification.  (*See* Pl. Mot. S.J., Ex. V (E-mail correspondence
between Lloyd London, NCRC and Janis L. Allen, Senior Legal
Counsel, Loan Administration Legal Group, Countrywide).)
Countrywide responded that it never received sufficient

verification of income from Coleman to complete a review of

Coleman's eligibility for a loan modification.  Countrywide's

counsel wrote:

> I believe the disconnect perhaps happened when we
> received only pay stubs and not the remaining financial
> information from Mr. Coleman.  The pay stubs we
> received via fax were too dark to read and we requested
> lighter copies.  Unfortunately, we never received
> updated copies.  Our office sent various follow up
> notes to your office and discussed the issue with Ruth
> Dickney as well.  After several attempts to complete
> this process, we closed the file.

(*Id.*)  Coleman asserts that he repeatedly submitted sufficient

verification of income to Countrywide through NCRC.

In May 2006, Countrywide explained to NCRC that Countrywide

could not approve Coleman for a loan modification until the tax

lien had been satisfied in full.  (Pl. Mot. S.J., Ex. EE (Letter

from Patricia Jordan, Workout Department, Countrywide to Tonya L.

Waller, Esq., Nov. 15, 2006).)

### June-July 2006: Countrywide Undertakes to Foreclose

On June 23, 2006, Countrywide sent Coleman a fourth

foreclosure notice, which stated that the minimum balance due on

the note to cure Coleman's default obligation was $43,147.18.

(Def. Mot. S.J., Att. 13 to Hyman Aff.)  The foreclosure sale was

scheduled for July 25, 2006.  (*Id.*)

On July 13, 2006, Coleman faxed a letter to Stephen

Goldberg, Esq., Countrywide's foreclosure counsel, in which he

requested a detailed accounting of the charges comprising the

12

$43,147.18 necessary to cure the default on his Mortgage,
including but not limited to "the total amount of attorney's
fees, the services for which the attorney's fees were applied and
the dates the charges were applied." (Pl. Mot. S.J., Ex. Y.)
Goldberg responded by e-mail to Coleman the same day, explaining
that the total default obligation was comprised of 28 monthly
payments in arrears, plus fees in the amount of $2000 for three
referrals by Countrywide to him for foreclosure between January
2005 and July 2006 as well as estimated costs for the scheduled
foreclosure sale in the amount of $2,000. (Def. Opp. to Pl. Mot.
S.J., Ex. 1 to Goldberg Aff.) Coleman replied to Goldberg
proposing a payment to suspend foreclosure for thirty days.
(*Id.*) Goldberg forwarded this request to Countrywide. (*Id.*)

### Bankruptcy Case Ensues, Stopping Foreclosure

On July 23, 2006, Coleman filed for bankruptcy, preventing
the foreclosure sale from going forward. On October 5, 2006,
Coleman's bankruptcy case was dismissed.

Countrywide again entered into loan modification discussions
with Coleman, but ultimately determined that he did not qualify
for a modification. (Def. Mot. S.J., Valvo Aff. ¶ 14.)

On November 3, 2006, Countrywide sent Coleman a fifth
foreclosure notice, which stated that the minimum balance due on
the note to cure Coleman's default obligation was $51,316.80.
(Def. Mot. S.J., Att. 15 to Hyman Aff.)

On November 15, 2006, Countrywide mailed Tanya L. Waller, Esq., Coleman's former counsel, a letter responding to her request for information regarding Coleman's account.  (Def. Mot. S.J., Att. 16 to Hyman Aff.)  On November 21, 2006, Goldberg sent to Coleman "payoff and reinstatement figures" requested by Waller "along with a breakdown of attorney fees and costs."  (Pl. Mot. S.J., Ex. DD.)

On November 30, 2006, the court entered an order granting Coleman's motion to reopen his bankruptcy case, preventing Countrywide from acting on its fifth foreclosure notice.

## II

Pursuant to Fed. R. Civ. P. 56 (as incorporated by Fed. R. Bankr. P. 7056), summary judgment will be granted where "there is no genuine issue as to any material fact and [] the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). A court must deny summary judgment where there is a genuine issue as to any material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  If the movant makes a properly supported motion, the burden shifts to the opposing party to demonstrate specific facts showing that there is a genuine issue for trial. *Id.*  The court must view the opposing party's evidence in the light most favorable to non-movant's position and draw inferences in favor of that party, provided such inferences are justifiable or reasonable.  *Matsushita Elec. Indus. Co., Inc. v. Zenith Radio*

14

*Corp.*, 475 U.S. 574, 587-88 (1986).

### III

Coleman's claim for breach of the implied covenant of good faith and fair dealing arises from his repeated requests for a second loan modification, which Countrywide declined.  Coleman argues that Countrywide promised to modify his Mortgage a second time in 2003 (when he made a $2,800 down payment as allegedly required by the modification terms), then in 2004 when responding to the inquiries of the DISB, and again in June 2006 in responding to NCRC, and did so without ever intending to actually modify the loan, thereby breaching the requirement of good faith and fair dealing.  (Pl. Opp. To Def. Mot. S.J. at 7-8.)  Coleman also argues that because Countrywide never intended to grant him a second modification, each time they agreed to consider the loan for modification, they did so in bad faith.  (Pl. Opp. To Def. Mot. S.J. at 8) ("Plaintiff's claim is not founded solely upon the fact that Defendant repeatedly reneged on its commitment to modify the loan but also upon the fact it repeatedly postured as negotiating a modification while having no intention of doing so.").

### A.

The undisputed material facts demonstrate that Countrywide's administration of Coleman's Mortgage comported with the requirements of good faith and fair dealing such that Countrywide

is entitled to summary judgment as to this claim.

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." *Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006) (quoting Restatement (Second) of Contracts § 205 (1981)). "If the party to a contract evades the spirit of the contract, wilfully renders imperfect performance, or interferes with performance by the other party, he or she may be liable" for breach of the implied duty of good faith and fair dealing. *Allworth*, 890 A.2d at 201 (citations omitted). "Good faith performance . . . of a contract emphasizes faithfulness to an agreed common purpose and consistency with the *justified* expectations of the other party; it excludes a variety of types of conduct characterized as involving 'bad faith' because they violate standards of decency, fairness or reasonableness." *Id.* at 201-202 (quoting Restatement (Second) of Contracts § 205 cmt. a) (emphasis added). "Bad faith means more than mere negligence." *Id.* at 202 (citation omitted). "Bad faith involves evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." *Id.* at 202 (quoting Restatement (Second) of Contracts § 205 cmt. a). Fair dealing requires "reasonable rather than arbitrary or capricious action." *Allworth*, 890 A.2d at 202 (citing *Adler v.*

16

*Abramson*, 728 A.2d 86 (D.C. 1999)).

Coleman repeatedly defaulted on his Mortgage. Once Coleman defaulted, Countrywide was not obligated to modify Coleman's Mortgage or otherwise engage in workout agreements that would give Coleman the opportunity to become current on his payments. Countrywide nonetheless repeatedly agreed to stay foreclosure proceedings at Coleman's request (in 2002, 2005, and 2006) and repeatedly agreed to consider Coleman's Mortgage for modification or some other workout arrangement. Although Countrywide determined that Coleman's Mortgage could not be modified a second time, the parties agreed to two repayment plans (in 2003 and 2004) and a forbearance plan (in 2004). That Countrywide was amenable to providing Coleman numerous opportunities to comply with the Mortgage, when not legally obligated to do so, demonstrates that Countrywide acted reasonably and without bad faith. *See Forsythe v. BancBoston Mortgage Corp.*, 135 F.3d 1069, 1076 (6th Cir. 1997) (concluding that mortgage company satisfied the implied covenant of good faith and fair dealing by providing mortgagor opportunities to comply with the contract though under no legal obligation to do so).

Countrywide's repeated consideration of the loan for modification and ultimate determinations that Coleman's Mortgage could not be modified a second time cannot be characterized as arbitrary or capricious or as made in bad faith. *See Miller v.*

17

*Bank of America*, 2005 WL 1902945, No. 01-1651, at *2 (D.D.C. Jul. 13, 2005) (rejecting a proposal to restructure a loan, where under no obligation to do so, does not constitute a breach of the implied covenant of good faith and fair dealing). Coleman has failed to assert facts from which the court could infer a genuine dispute as to Countrywide's intent in agreeing to repeatedly consider his loan for modification. Coleman's sole specific factual allegation in this regard is that Countrywide declined to modify his Mortgage in 2006 until Coleman satisfied the outstanding tax lien, which Countrywide had discovered in a title search as part of reviewing his loan's eligibility for modification. Coleman asserts that Countrywide should have known about the tax lien as early as 2002, when it approved his first loan modification, and its expedient reliance on the tax lien to justify declining a second modification in 2006, demonstrates that Countrywide never intended to grant him a loan modification. But Countrywide was under no obligation to consider Coleman's loan for modification in the first place. And throughout five years of workout discussions, Countrywide did not interfere with Coleman's performance under the Mortgage, render imperfect performance, or show any lack of diligence throughout workout discussions with Coleman. In short, Countywide did not perform in bad faith or act unreasonably by agreeing to review his loan for modification or any other type of workout. Countrywide

cannot be accused of having engaged in bad faith by holding off foreclosing while it discussed possible arrangements short of foreclosure, and had the absolute right to proceed to foreclosure without exploring such possible arrangements.

Furthermore, as discussed below, Coleman's allegations that Countrywide promised to modify his Mortgage first in 2003, then in 2004, and again in 2006 do not withstand close scrutiny.

B.

As to the events of 2003, Coleman asserts that a Countrywide employee promised to modify his loan upon receipt of a $2,800 payment, that Countrywide withdrew that promise upon accepting and depositing the $2,800 payment in April 2003, and that Countrywide later clarified that the Countrywide employee was not authorized to grant him a loan modification.  (Pl. Mot. S.J. at 3-4.)  But Coleman himself characterized his $2,800 payment in 2003 as an initial payment *towards a workout or loan modification*, not as a loan modification that had actually been agreed to.

Moreover, Coleman had received a written loan modification agreement to execute when he entered into the loan modification agreement in 2002.  He never received a written loan modification agreement to execute as a result of the $2,800 payment made in April 2003.  By July 2003, he was told that no modification agreement was possible.  On July 24, 2003, he proceeded to accept

the Repayment Plan Agreement, in which he released Countrywide
from all claims relating to the loan (which would have included
any claim based on an improper failure to abide by an agreement
to send him a second loan modification agreement to execute or a
claim of dealing with him in bad faith with respect to the loan).
Countrywide cannot be accused of acting in bad faith when it
proceeded based on the Repayment Plan Agreement that represented
the parties' resolution of their discussions preceding the
execution of that agreement.

   If Coleman believed that the $2,800 payment should be
returned to him (because he believed it was to be held only if a
modification agreement was executed), he could have requested
that it be returned to him.  Instead, he entered into the
Repayment Plan Agreement under which the $2,800 payment was, of
course, taken into account in fixing the amounts required to be
paid under the Repayment Plan Agreement in order to avoid
foreclosure.  Coleman cannot be heard to complain that
Countrywide has proceeded in bad faith in accepting and retaining
the $2,800 when he agreed to a Repayment Plan Agreement that
plainly displaced any modification agreement that may have been
discussed as a possibility or that he thought had actually been
agreed to, and that effectively addressed how the $2,800 payment
was to be handled.  Again, Countrywide acted in good faith in
assuming that the Repayment Plan Agreement reflected the

resolution of the parties' discussions in 2003.

Finally, Coleman could not reasonably believe that a
modification agreement had been reached in April 2003.
Countrywide and Coleman agreed not to be bound by any workout
agreement not reduced to writing and signed by both parties.
Countrywide required Coleman to sign a Negotiation Agreement each
time he engaged in loan modification discussions with
Countrywide.[5]  The Negotiation Agreement is clear that no workout
agreement--loan modification, repayment plan, forbearance plan,
or otherwise--would be effective until in writing and signed by
both Coleman and Countrywide.  Coleman does not dispute these
facts.  There is no written evidence of a second loan
modification agreement at any time even though the first loan
modification agreement, both repayment plan agreements and the
forbearance plan agreement were reduced to writing and signed by
Countrywide and Coleman.  Given the Negotiation Agreement's
requirement of a written agreement for any workout and the
existence of written agreements in Coleman's other workouts,
Coleman did not justifiably expect that Countrywide had agreed to
modify his loan based on the alleged oral representations of a

---

[5]  As established by Valvo's affidavit, Countrywide's
business practice was to require a borrower to sign a Negotiation
Agreement each time she entered loan modification discussions
with Countrywide.  Coleman does not dispute that he signed such a
Negotiation Agreement incident to the discussions in 2003 of a
possible loan modification.

21

Countrywide employee, and Countrywide cannot be said to have performed in bad faith in insisting that no modification agreement would exist unless it was reduced to writing.

If, as Coleman asserts, Countrywide acknowledged that an employee had agreed to modification terms but Countrywide told Coleman that the employee was not authorized to enter into a modification agreement, that does not demonstrate bad faith. Instead, it represents the prudent business practice of insisting that any loan modification terms are not effective unless and until reduced to a writing executed by both parties, in part to assure that an employee does not bind the lender to imprudent unauthorized terms, and in part to assure that an oral commitment does not lead to a dispute as to what precisely was agreed to. Here, it appears that a second loan modification agreement would have violated a Countrywide policy of not entering into a second loan modification agreement within one year of an earlier loan modification agreement, and, in any event, the final decision maker at Countrywide had the right to decline approval of any modification agreement.

### C.

Countrywide's correspondence with the DISB in 2004 and with NCRC in 2006 plainly did not constitute a commitment to modify the loan, but merely a commitment to discuss possible arrangements with Coleman.

22

A review of the events that transpired in 2004, as
recounted by Coleman, demonstrates that Countrywide merely agreed
at that time to engage in workout discussions, and did not
promise to modify his loan.  According to Coleman, the DISB told
him on April 1, 2004, that Countrywide had agreed to modify his
loan and would mail him a "modification package."  (Pl. Mot. S.J.
at 4.)  But a letter dated March 31, 2004, from Countrywide to
the DISB, copying Coleman, refers more generally to a "workout
package" and merely confirms that Coleman's Mortgage would not be
referred to foreclosure pending discussion of "workout options
that may be available."  (Pl. Mot. S.J., Ex. O.)  A loan
modification is only one type of workout, and it appears that the
DISB used the terms interchangeably in error.  As of April 2004,
Coleman and Countrywide had engaged in workout discussions at
least twice (in 2002 and in 2003) and had entered into the Loan
Modification Agreement and the Repayment Plan such that Coleman
must have been aware that a workout and a modification are not
the same.  Moreover, even if Countrywide committed to discuss a
loan modification, that does not demonstrate the existence of a
modification agreement.

Nor did Countrywide commit to NCRC during 2005 or 2006 that
Countrywide would modify Coleman's Mortgage.  Coleman asserts
that NCRC told him that Countrywide had agreed to modify the
loan, but Coleman could not reasonably rely on NCRC's statements

as establishing what Countrywide had agreed to.  Moreover,
Countrywide merely agreed to consider the loan's eligibility for
modification.  Coleman claims that at some point in the review
process, Countrywide agreed to modify his loan provided he submit
certain financial documents.  But it is clear that Countrywide
communicated to NCRC and Coleman that it required financial
information from Coleman in order to complete the review, not in
order to finalize a modification.  There is no evidence that
Countrywide orally committed to a modification (and even if it
had, no modification was effective unless reduced to writing as
discussed above with respect to the loan modification discussions
in 2003).

IV

Countrywide is also entitled to summary judgment as to
Coleman's breach of contract claim, which is actually a claim
that Countrywide violated RESPA by failing to timely and
sufficiently respond to his July 13, 2006 request to
Countrywide's foreclosure counsel for information regarding

charges on his account.[6]

RESPA is a federal consumer protection act that governs how and when loan servicers must respond to requests from borrowers for information concerning servicing of their loans. *See* 12 U.S.C. § 2605(e).[7]   Under RESPA, the "servicer" of the loan must

---

[6] Coleman characterizes the claim as a breach of contract claim because of a paragraph in the Bank of America Servicing Disclosure Statement which summarizes Countrywide's RESPA obligations as a loan servicer:

> Section 6 of RESPA (12 U.S.C. Section 2605) gives you certain consumer rights, *whether or not your loan servicing is transferred*.  If you send a "qualified written request" to your loan servicer concerning the servicing of your loan, your servicer must provide you with a written acknowledgment within 20 Business Days of receipt of your request.  A "qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number, and your reasons for th request.  Not later than 60 Business Days after receiving your request, your servicer must make any appropriate corrections to your account, or must provide you with a written clarification regarding any dispute.

(Pl. Mot. S.J., Ex. FF.)  The Disclosure Statement goes no further than summarizing the lender's RESPA obligations and thus cannot be viewed as creating a contractual obligation above and beyond the RESPA claim.

[7] Section 2605(e) provides:

> If any servicer . . . receives a qualified written request from the borrower (or an agent of the borrower) for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within 20 days . . . Not later than 60 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any borrower of any qualified written request . . . the servicer shall . . .

respond to a "qualified written request" from a borrower with a

written acknowledgment within 20 days of the request and with a

more substantive response, including any necessary corrections to

---

(A) make appropriate corrections in the
account of the borrower, including the
crediting of any late charges or penalties,
and transmit to the borrower a written
notification of such correction (which shall
include the name and telephone number of a
representative of the servicer who can
provide assistance to the borrower);

(B) after conducting an investigation,
provide the borrower with a written explanation or clarification

(i) to the extent applicable, a
statement of the reasons for which
the servicer believes the account
of the borrower is correct as
determined by the servicer; and

(ii) the name and telephone number
of an individual employed by, or
the office or department of, the
servicer who can provide assistance
to the borrower; or

(C) after conducting an investigation,
provide the borrower with a written
explanation or clarification that includes--

(i) information requested by the
borrower or an explanation of why
the information requested is
unavailable or cannot be obtained
by the servicer; and

(ii) the name and telephone number
of an individual employed by, or
the office or department of, the
servicer who can provide assistance
to the borrower.

12 U.S.C. § 2605(e).

the borrower's account, within 60 days of receipt of the request.
12 U.S.C. § 2605(e).  Under RESPA, "the term 'servicer' means the
person responsible for servicing of a loan (including the person
who makes or holds a loan if such person also services the loan).
. . ."  12 U.S.C. § 2605(i)(2).

Coleman's RESPA claim fails because he delivered his July
13, 2006 request to Countrywide's foreclosure counsel, Goldberg,
rather than to Countrywide, in the context of an imminent
foreclosure, and without notice to counsel that he was invoking
RESPA.  The statute does not identify the servicer's counsel as
an authorized agent of the servicer for purposes of receiving and
responding to RESPA requests.  That is not to say that a RESPA
request can never be sent to the servicer's counsel, only that
"[b]efore an attorney is to be held accountable as an agent by
virtue of [RESPA] which does not itself pre-authorize an attorney
as the lender's agent in this context, the attorney should be
placed on notice that he or she is being approached in that
capacity."  *Payne v. Mortgage Elec. Registration Systems, Inc.
(In re Payne)*, 387 B.R. 614, 635 (Bankr. D. Kan. 2008) (holding
that delivering a request for information to the servicer's
counsel with notice of invoking RESPA is insufficient to trigger
the servicer's RESPA obligations).

Coleman asked Goldberg for a "detailed accounting" of the
charges comprising his $43,147.18 default obligation, including

27

"the total amount of attorney's fees, the services for which the attorney's fees were applied and the dates the charges were applied" ten days before the scheduled foreclosure.  (Pl. Mot. S.J., Ex. Y.)  Goldberg cannot reasonably be considered to have had notice that Coleman was invoking RESPA in this context. Furthermore, RESPA's procedures are expressly designed to help borrowers obtain timely and sufficient information from their loan servicers, and because the servicer is better-equipped than counsel to respond to borrower inquiries about specific charges and other activity on their accounts, it would be unreasonable to impose on a servicer's counsel full and equal responsibility under the statute to respond to RESPA requests.

V

Coleman's claims are integrally related to the proof of claim that Countrywide filed regarding the mortgage debt.  In the main bankruptcy case, on the same basis as he seeks an affirmative recovery from Countrywide in this adversary proceeding, Coleman has objected to $45,000 in interest charges and attorney's fees asserted in the proof of claim.  That objection to claim is awaiting the outcome of this adversary proceeding.  The debtor's confirmed plan is subject to modification--to request increased plan funding and increased payments by the debtor to the chapter 13 trustee--if necessary based on resolution of the objection to claim.  Coleman's

complaint can be viewed as a counterclaim to the proof of claim (indeed, he requested leave in the main case to file a counterclaim against the proof of claim), and as asserting a defense by way of offset against Countrywide's claim arising out of the very same facts as Countrywide's claim against the estate.

The motions for summary judgment thus present "matters concerning the administration of the estate" under 28 U.S.C. § 157(b)(2)(A), the "allowance or disallowance of claims against the estate" under 28 U.S.C. § 157(b)(2)(B), and "counterclaims by the estate against persons filing claims against the estate" under 28 U.S.C. § 157(b)(2)(C).[8]  The summary judgment motions are thus core matters under those provisions of 28 U.S.C. § 157(b).  *See Bankruptcy Services, Inc. v. Ernst & Young (In re CBI Holding Co., Inc.)*, 529 F.3d 432, 460-64 (2d Cir. 2008).[9]

---

[8]  Coleman is exercising the powers of a trustee in suing on the claims against Countrywide (which are assets of the estate). *See Dawson v. Thomas (In re Dawson)*, 2008 WL 1700419 (Bankr. D.D.C. Apr. 9, 2008).

[9]  *See also Statutory Comm. of Unsecured Creditors v. Motorola, Inc. (In re Iridium Operating, LLC)*, 285 B.R. 822, 831-32 (S.D.N.Y. 2002):

> Traditionally non-core claims against a creditor in an adversary proceeding will be considered core if: (1) the claim arises out of the same transaction as the creditor's proof of claim or setoff claim, or (2) the adjudication of the adversary proceeding claim would require consideration of issues raised by the proofs of claim or setoff claim such that the two claims are logically connected.

(Citations omitted.)

Moreover, the parties have both requested that the court enter judgment granting their respective motions for summary judgment, and can be viewed as consenting to the court's treating the motions as presenting a core matter, and whether core or non-core, the standard of review of the propriety of summary judgment would be the same.  The court's judgment will be reviewable de novo by way of appeal under 28 U.S.C. § 158(a)(1).  The granting of summary judgment presents only a question of law reviewable, by way of appeal, based on a de novo standard of review no substantively different than the de novo standard of review when review is sought by way of the procedures applicable in a non-core proceeding.

VI

For the reasons set forth above, the court will grant summary judgment in favor of defendant Countrywide dismissing the claims made against them.  A judgment will follow.


[Signed and dated above.]


Copies to: All counsel of record; Office of United States Trustee.

30